# ATTACHMENT A

# TO BOSWELL

# DECLARATION

# PART 2



# 3. THE DEPARTMENT'S DECEMBER REPORT ON SETTLEMENT OPTIONS

The Department's December report categorized potential Tribal claims into three types (Type 1, 2 or 3) and presented options for resolving each type of claim. As a result of our consultation with Tribes, the proposals contained in this report are significantly different from the settlement options described in the December report. As background, a brief description of the options contained in the December report, as well as Tribal comments on those options, follows:

## Type 1 Claims

Type 1 claims included those claims based on transactions in which an error was identified in the Reconciliation Project, or known errors. The options to address Type 1 claims outlined in the December report were fairly straightforward, because it is the Department's view that known errors due to Tribes must be paid. The options focused on how to pay them. Some of the known errors involved transactions where a Tribe's account balances were understated; others involved overstatements of Tribal account balances. In fact, more errors involved overstatements of Tribes' balances ($14 million plus interest) than understatement ($13.1 million plus interest). Therefore, a total of slightly more than $27 million (absolute value) of known errors was identified for the entire Project.

Type 1 claims also included interest due to a "lag time" between when funds were collected by the BIA and when they were deposited in an account and began to earn interest. Lag time also occurred during the time between when money was deposited by the Minerals Management Service (MMS) and when it was actually credited to the Tribal accounts by BIA. Sometimes, that "lag time" period was longer than it reasonably should have been. We assumed an appropriate period would be no longer than six days for the first type of lag time and that interest be paid beginning immediately when funds are deposited by MMS for the second type. The lost interest calculated as a result of unreasonable "lag time" amounts to about $6 million ($5.5 million is attributed to BIA deposits and $.5 million is attributable to MMS deposits).

Another category of Type 1 claims is called undocumented "roll forward" amounts. An undocumented roll forward amount occurs when the account balance on the last day of an accounting period (usually a year) was not the same as the account balance on the first day of the next accounting period. Sometimes the balances went up, sometimes the balances went down. Excluding roll forward differences that netted to zero among a single Tribe's accounts, there were $17.5 million in unexplained decreases (no netting) at the conclusion of the Project. This amount has since been reduced to $902, as a result of further OST and Arthur Andersen work to research and document such decreases.

The options identified in the December report for resolving Type 1 claims provided that the government would pay a Tribe where a known error resulted in an understatement of the Tribe's account balance, and would net out and forgive amounts due where the Tribe's account balance was overstated by the government. In addition, the options discussed whether to repay the Tribes with simple interest or compound interest at the so-called Tribal benchmark rate, which is the average annual yield of invested Tribal trust funds for the period. This rate tends to be skewed to the high side because of one large account holder's long-term investments. The December report suggested repayment with simple interest.

The options also addressed whether all overstatements to the accounts should be forgiven and all understatements restored, or whether overstatements should be netted against understatements at the "Tribal" level (all overstatements and understatements to a Tribe's accounts netted against each other notwithstanding whether the errors occurred in the same or different accounts

of that Tribe) or netted at the account level (netting of overstatements and understatements in each account of the Tribe). The report proposed netting at the Tribal level, with forgiveness of any net overstatement.

## Type 2 Claims

Type 2 claims involved circumstances in which a Tribe had additional documentation relating to the Tribal account balance as reconciled that could evidence a previously unidentified error. In addition, Type 2 claims included so-called "passed adjustments," where BIA and Arthur Andersen disagreed on the adequacy of documentation to reconcile a transaction. There were $10,954,684 (absolute value) in "passed" adjustments, of which $4.3 million (absolute value) was subsequently reviewed and cleared by Arthur Andersen. The December report suggested an informal negotiation process between the Tribe and the OST under the auspices of a mediator, in the event there was a disagreement about reconciling a transaction based on the additional Tribal documentation. If mediation was unsuccessful, the transaction would be resolved as a Type 3 claim.

## Type 3 and Other Claims Outside the Scope of the Project

Type 3 claims represented those arising from the $2.4 billion in unreconciled transactions initially identified in the Project. Comments also were sought regarding possible approaches for resolving other claims, including those outside the time frame and scope of transactions considered in the Project. These include, for example, not only pre-1972 claims relating to management and accounting of trust funds, but also those involving the Department's management of the underlying trust assets in any time period.

Developing an equitable process for resolving potential Type 3 claims was not a simple task. On the one hand, guidelines governing the Project indicated that a transaction would not be considered reconciled without certain documentation to verify that funds were handled as reflected in the general ledger. On the other hand, there was no indication during the course of the Project that Tribal funds had been intentionally misposted, misappropriated, or misdirected, although the Project did not specifically include procedures to examine fraud. And, as noted above, for the 86 percent of non-investment transactions reconciled in the basic reconciliation procedures of the Project, the error rate was low — .01 percent.

To resolve potential claims relating to unreconciled transactions, the Special Trustee's Advisory Board proposed a payment of $300 million to be distributed proportionately to all Tribal account holders, based on the product of the percentage of the Tribe's unreconciled disbursements plus interest and the total of all unreconciled disbursements plus interest. In addition, the Advisory Board proposed a general settlement amount of $300 million that would be used as partial capital for a proposed Development Bank for American Indians, in further settlement of claims arising from the unreconciled transactions. The Department's December report solicited views on whether Tribes would support a global settlement, such as a Development Bank, some other Tribal economic development initiative, or a fractionated ownership land acquisition fund, or whether Tribes preferred individual settlements with each Tribe.

## Tribal Comments on the Options

A series of meetings with affected Tribes was held after the Department submitted its December report to Congress. Tribes also were given 60 days to submit written comments. All of the comments — oral and written — were carefully analyzed and considered in the preparation of our current proposal. A total of 35 different Tribes participated in the four regional hearings held in Portland,

Oregon (January 6, 1997); Denver, Colorado (January 8, 1997); Phoenix, Arizona (January 10, 1997); and Washington, D.C. (January 24, 1997). Transcripts of the hearings were maintained. In addition, written comments were received from 15 Tribes by the closing date of February 12, 1997.

The consultation process was provided as an opportunity for Tribes to comment on the specific options outlined, but the comments went beyond the scope of those options. Rather than summarizing the comments on the specific options here, we have attempted to address many of the comments in describing our settlement proposal and how it was changed from the December report options. In addition, we maintained transcripts of the consultation hearings and those transcripts and the written comments are available for public inspection from the BIA. Some Tribes expressed the following, more generic concerns, which serve as a useful backdrop for the Tribal comments on the options themselves.

Some of the Tribes, both in comments at the meetings and in formal written comments, questioned the nature and scope of the Project and said it was not a reliable foundation on which to base a settlement. They pointed to the fact that its examination of accounts was limited to 1972 through 1992. Others pointed out that some reconciliation tasks (investment analysis) were not performed between fiscal years 1972 and 1977, arguing that the Project amounted to a study of 15 years, rather than 20 years. They also asserted that they had had difficulties accessing the Arthur Andersen work papers. A number of Tribes commented that the Special Trustee had recommended that the Tribes not accept the Project findings. While recognizing the limitations of the Project, we describe the Department's reasons for relying on the reconciliation results in our discussion of the settlement proposal following this section.

A number of Tribes also found fault with the limited time given Tribes to comment between receipt of the options paper in December 1996 and the four regional hearings in January and the deadline for written comments in mid-February 1997. We understand that Tribes may have desired more than 60 days to review and comment on our proposed options; however, we believe that there will be further opportunity for Tribal input as we work with Congress to reach a final resolution of this issue.



# 4. THE SETTLEMENT PROPOSAL

## Scope of the Settlement

There was significant discussion during the consultation process about the period that should be covered by a settlement. Some suggested that the settlement should cover all Tribal trust fund accounting claims arising during the period 1946 to the date of settlement, since any claims preceding 1946 were extinguished by the Indian Claims Commission Act. Others argued that claims from any period that the Department managed trust accounts should be covered, even as far back as 150 years. There also is a credible argument that 1984 to the date of settlement may be the appropriate period, based on the Tucker Act's general six-year statute of limitations for claims against the government. The basis for this argument is the annual Appropriations Acts for fiscal years 1991 through 1997, which toll the statute of limitations on any claim concerning losses to or mismanagement of trust funds until the affected tribe or individual Indian has been furnished with an accounting of such funds. Accordingly, the Appropriations language preserves all existing claims as of its enactment in 1990, which would include only those six years old or less — in other words, claims from 1984 forward.

After considering all these arguments, the proposed settlement covers at least the period July 1, 1972, through September 30, 1992, and at Tribes' option, through the date of settlement. We have chosen this period for several practical and policy reasons. First, we believe there is little or no legal basis to include claims arising prior to 1946. The Indian Claims Commission statute quite clearly specified that the Commission proceedings were to be the process by which all claims arising prior to 1946, whether in law or equity or based upon fair and honorable dealings, would be settled. That Tribes understood this included claims based on trust fund management is demonstrated by the fact that a significant number of claims involving federal government management of trust funds were heard and decided by the Commission.

With respect to the possibility of using either 1946 or 1984 as the cutoff points, there are also credible statute of limitations arguments (although the argument for the 1984 date is more persuasive). Nevertheless, we believe the 1984 date would produce a harsh result. In addition, the Committee report language accompanying the Appropriations Acts specifies that the language is intended to preserve claims for discrepancies uncovered during the Reconciliation Project (which covered 1972 to 1992). Most important, we have developed a significant amount of data regarding the Tribal accounts and potential claims from July 1, 1972 through September 30, 1992, and have been performing daily reconciliation of accounts since that time. In contrast, we have accumulated no data about Tribal accounts for the 1946-1972 period. At this juncture any effort to quantify discrepancies and possible losses for the pre-1972 period would be little more than conjecture.

Moreover, the July 1, 1972 date is a natural demarcation because it represents the date on which there was a fundamental change in the manner in which trust funds were managed. As previously noted, prior to 1972, the Department of the Treasury had Tribal accounts listed within its systems, although BIA had some role in reporting the amounts to be placed in the accounts. It was not until 1972 that BIA took on exclusive management responsibility for Tribal trust funds (with one combined account for all Tribes at Treasury).

Finally, this proposal is in the form of a legislated settlement. The July 1, 1972 to September 30, 1992 period, with optional settlement of the post-1992 period, is supported by the extensive analysis performed in the reconciliation and the internal OTFM reconciliation procedures for post-1992, and is a middle ground between the other alterna-

tives, none of which is without legal dispute. Certainly, in the context of a legislated settlement, Congress has the discretion to define the period for which it will agree to settle trust funds claims or even allow the courts to entertain litigation. Should Congress determine that pre-July 1, 1972 claims should be settled, however, the Department could be directed to evaluate possible approaches to determining whether losses were suffered as a result of the management of the Tribal accounts. One approach could be through an extension of the reconciliation process. We are skeptical, however, that such an effort would produce satisfactory results. There is a significant likelihood that many of the relevant documents, more than 25 years old, will not be found. Moreover, the effort would likely be very costly, given that the reconciliation for the July 1972 - September 1992 period took five years and cost $21 million.

Alternatively, there may be statistical or sampling methods that could be used to estimate potential losses. Although it is not yet clear whether sufficient information can be efficiently gathered to develop statistically reliable estimates, if an approach could be successfully developed, it would result at best in a rough estimate of any losses. In short, setting aside the uncertainty about whether the statute of limitations would bar such claims, the Department does not now recommend a settlement process for years preceding July 1, 1972, because it has virtually no data relating to transactions in that period.

## Global Settlement

There has been ample debate about the prudence of attempting to construct a "global settlement" that would resolve the universe of all Tribal claims through some singular, programmatic action. One global settlement suggestion is the Special Trustee's proposal that the settlement proceeds partially fund an Indian Development Bank, with some $600 million in capitalization, to finance Tribal projects. Without endorsing the concept of a global settlement approach, the December report sought comments from Tribes on their interest in such an approach and identified several possible alternatives in addition to a development bank, including a general development fund and a fund for Tribes to purchase fractionated interests in land. The December report noted that in order to be viable, a large portion of Tribes would have to agree to participate in a global settlement. There also would have to be consensus on what the global settlement mechanism would be and what each Tribe's entitlement and participation would be.

Based on comments received during the consultations with Tribes, the Department does not believe that the global settlement approach is workable or desirable. Tribes generally appeared to favor government-to-government negotiations which recognize the individual circumstances of each Tribe and its claims against the federal government. There appeared to be little consensus on what type of global settlement mechanism would be appropriate. In particular, there did not appear to be broad-based support for a development bank, if it were to be funded with money due to individual Tribes. Because there was no consensus on whether a global settlement approach would be appropriate and what form it should take, and because Tribes generally favored an approach recognizing their individual circumstances, this proposal focuses on a process to make settlement payments directly to Tribes. Those payments would, in part, reflect the value of each Tribe's actual claims and would allow Tribes to use their settlement funds as each deems appropriate.

## Overview of the Settlement Proposal

The Department's proposal is designed to provide an opportunity for Tribes to settle all of their Tribal trust fund accounting claims with the government for the period July 1, 1972 through

September 30, 1992, and potentially through the date of settlement.[5] The government would report to Tribes all known errors, and would credit Tribes' accounts in the amount of those known errors due Tribes on a net basis, with compound interest, as soon as possible after the results of the additional reconciliation work have been presented to the Tribes for their review and consideration, and funds are appropriated. The government would credit known errors up front, whether or not a Tribe accepts the government's settlement offer for any other claims.

After crediting the known error amounts to Tribes' accounts, the proposal entails a two-stage settlement opportunity for resolving accounting claims other than those relating to known errors. In stage one, the government would offer each Tribe the opportunity to settle claims immediately for a specific sum based on a formula that takes into account the particular characteristics of the Tribe's accounts. If the Tribe accepts the offer, the settlement would be paid according to the formula and all covered claims against the government would be extinguished. If the Tribe does not accept the offer, it would be withdrawn and stage one would be concluded.

In stage two, Tribes would have the opportunity to engage in government-to-government settlement negotiations with a mediator. The mediation process would be non-binding. As part of this process, there would be a limited opportunity to obtain additional data or undertake additional analysis to the extent it would be constructive in reaching a satisfactory resolution of claims. This aspect of the proposal is a fundamental change from the December report, and is designed to respond to the requests of the Tribes to respect the sovereignty and individual circumstances of each Tribe in settling their claims. If the mediation process does not successfully resolve the Tribe's claims against the government, a Tribe could file a claim in the U.S. Court of Federal Claims.

### Additional Reconciliation

Since completion of the Project, the Department, through the firm of Chavarria, Dunne & Lamey LLC, supported by OST staff, has continued to search for additional documentation to reconcile more of the $2.4 billion in unreconciled non-investment transactions. That work has focused solely on disbursement transactions. Employing the same agreed-upon procedures used in the Project, as of September 30, 1997, OST has reconciled an additional $445 million or 55 percent of previously unreconciled disbursements, thereby reducing the unreconciled transaction from $2.4 billion to $1.97 billion. The results of this additional reconciliation work will be presented to the Tribes for their review and consideration in the near future.

In addition to settlement of claims based on further research of transactions during the Project period of July 1, 1972 - September 30, 1992, the proposal is intended to cover, at the Tribe's option, any claims arising since September 30, 1992, through the date of settlement, based on the ongoing internal reconciliation being performed by OST. For each year since FY 1992, OST has been performing various internal cash and investment reconciliation procedures and providing some form of reports on Tribal trust investments. These procedures, for the periods, October 1, 1992 to March 31, 1995, and April 1, 1995 to present, are as follows:

---

[5] For purposes of the settlement, accounting claims would include claims relating to the governments's management and accounting of trust funds from the point of their collection though disbursement, including collection of the appropriate amounts under lease, permit or sale agreements or other contracts, proper recording of transactions, timely collection of revenues, appropriate investments and proper disbursements. The settlement process would not address claims related to management of the underlying trusts assets because the Project was focused on addressing accounting issues, not resource management issues.

From October 1, 1992 to March 31, 1995:

- Tribal Trust cash receipts and cash disbursements were processed and confirmed by the U.S. Treasury and were reconciled to Tribal Trust cash transactions posted to the OTFM Trust Funds Management System (TFMS).

- Tribal Trust TFMS investment balances were reconciled to a Moneymax subsidiary investment ledger.

- Periodically, then monthly, custodian investment statements were reconciled to the Moneymax subsidiary system (at Par value).

- MMS oil and gas receipts information was faxed daily from MMS to OTFM (for investment purposes) and was verified to intergovernmental transfer documents known as Voucher and Schedule of Withdrawal and Credits (SF-1081s).

From April 1, 1995 to present:

- Tribal Trust Funds cash receipts and cash disbursements have been processed and confirmed by the U.S. Treasury and have been reconciled daily and monthly to Tribal Trust Funds cash transactions posted to the Omnitrust System.

- Investments have been reconciled daily to the Omnitrust System and have been reconciled monthly to custodial account statements (at Par value).

- MMS oil and gas receipts information has been faxed daily from MMS to OTFM (for investment purposes) and has been verified to respective SF-1081s.

The reconciliations to the U.S. Treasury suggest that there has been an accounting and reporting of all OTFM (trust) transactions, thereby mitigating discrepancy and loss concerns after September 30, 1992.

Some of the largest proposed adjustments for the twenty-year reconciliation period resulted from errors in investment income posted to Tribal accounts, recalculation of U.S. Treasury interest earnings, and differences between general ledger transactions versus U.S. Treasury transactions. Procedures implemented after September 30, 1992, as described above, are considered adequate to ensure that these errors do not reoccur. In addition, the group of errors referred to as undocumented "roll forward" amounts also have been eliminated by the procedures and systems implemented after FY 1992.

The post-FY 1992 procedures do not address the circumstances that result in unacceptable lag times (the time between when the United States received payment and when the payment was deposited in a Tribal account and began earning interest), however, so it may be presumed that post-FY 1992 errors due to excessive lag times will be consistent with those identified by the Reconciliation Project for the July 1972 to September 1992 time period. Based on these procedures and account information, the Department will formulate a settlement proposal to provide Tribes the opportunity to resolve all accounting claims through the date of settlement.

### Settlement of Known Errors

After the initial presentation to the Tribes of the additional reconciliation information, the first step of the proposed settlement process would be for the government to compensate Tribes for losses associated with errors it discovered during the Project, and losses identified as a result of the additional reconciliation work (identified as "known errors" or Type 1 claims in the December

report). Compensation would include principal plus interest as described below. Known errors would be paid as soon as possible, regardless of a Tribe's willingness to accept the proposed settlement of any other claims based on remaining unreconciled transactions.

As discussed above, there are three types of claims relating to known errors. First, in the basic reconciliation portion of the Project, approximately $1.87 million in non-investment transactions (excluding interest) were found to be in error — an error rate of about .01 percent.[6] An additional $25.2 million (absolute value) in proposed adjustments were identified in the entire Project, which, in addition to the basic reconciliation, included the assessment of the accuracy of investment income posted to Tribal accounts; recalculation of U.S. Treasury interest earnings; reconciliation of general ledger transactions with U.S. Treasury transactions; verification that financial transactions posted to the accounting records were in agreement with the originating lease or sale agreements, permits, or contract terms; and a determination of the timeliness of the deposit of receipts. All such known errors identified in the Project, as well as those identified in subsequent research efforts, due to Tribes would be paid.

Second, there are Tribal accounts which may be due interest because of unacceptable "lag times" — the time between when the United States received payment and when the payment was deposited in a Tribal account and began earning interest. Because of the remote locations of many BIA agency offices, and the fact that electronic funds transfer was not prevalent during much of the July 1972 to September 1992 period, we believe the government is entitled to a commercially reasonable time to post funds to an interest-earning account. Accordingly, we propose to compensate for interest that should have begun to accrue six days after funds were paid to the BIA. However, with respect to funds deposited by MMS in the Treasury, interest would be paid from the date of deposit. Interest owed to the Tribes as a result of lag times is estimated to be about $4 million.

The third type of known errors involves so-called undocumented "roll forward" amounts. These amounts resulted from end-of-accounting period account balances in BIA's general ledger that did not equal the balance (whether higher or lower) recorded in the general ledger at the beginning of the subsequent accounting period. The December report identified $26.1 million in principal in cases where an account balance increased and $17.5 million in principal where a Tribe's account balance decreased. With respect to instances where account balances increased, we proposed that the government "forgive" any such amounts, without performing further research to explain the increase. That recommendation has not changed. With respect to decreases, the December report stated that OST was continuing its efforts to research and document roll forward adjustments where a Tribe's balance decreased from one accounting period to the next. These efforts have continued and the results have been reviewed by Arthur Andersen. As a result of that effort, there remains only $902 of undocumented roll forward adjustments where account balances decreased. The Department proposes that any remaining undocumented roll forward amounts should be paid, subject to netting against any other amounts owed by the Tribe, as described below.

### Rate of Interest

The December report recommended that for settlement, Tribes be paid simple interest at a Tribal benchmark rate, which is defined as the

---

[6] The $1.87 million does not include adjustments of less than $1,000 that were accepted without further research. These are referred to as "scoped adjustments" and total $83,417.00 (absolute value). These scoped adjustments would also be considered known errors and paid.

average annual yield on invested Tribal trust funds. While the general practice in litigation is for interest to be paid at a rate established by statute for funds that are improperly disbursed by the federal government, we felt that the Tribal benchmark rate, which generally would be more generous than the statutory rate, more closely approximates what Tribes would have earned on their investments. This higher rate also is intended to serve as an incentive to settle rather than litigate. When OTFM converted to the OMNI Trust System in fiscal year 1995, it began using an average Five Year Treasury rate in lieu of the Tribal benchmark rate.

There was considerable opposition among Tribes in the consultation to the payment of simple rather than compound interest. The December report indicated that the government is required to pay only simple interest on improperly disbursed funds in a litigation context. Tribes persuasively argued during consultation, however, that they would have earned compound interest had errors not been made. Moreover, since the Department's objective is to provide an additional incentive for settlement, compound interest is more appropriate. The Department agrees with these comments, and now proposes that in paying known errors, interest be annually compounded and paid at the Tribal benchmark rate through fiscal year 1994, and the average Five Year Treasury rate for years beginning in fiscal year 1995.

### Netting and Forgiveness

The Project results indicated that, of the errors reported, some were to the detriment of the Tribes ($13.1 million) while others were to the benefit of the Tribe ($14 million). Thus, if all errors were simply to be paid without netting the positive and negative errors against each other and without forgiveness, Tribes, in the aggregate, would owe the government more than the government would owe Tribes.

The Department concluded that Tribes should not be required to pay money to the government for errors that accrued to the Tribes' benefit, because we thought it would be inequitable and unduly burdensome to do so, given the government's responsibility for the errors. At the same time, we wanted to avoid the potential windfall that could occur if the government paid Tribes for its errors but Tribes would not have to pay the government for errors to its benefit. Accordingly, some form of netting and forgiveness of errors due to and due from a Tribe was considered appropriate. There were two principal netting options considered: (1) errors (including interest) within each account owned by a Tribe would be netted against each other, and payments would be made to each account with a net balance due (netting to the "account level"); or (2) errors (including interest) occurring in all accounts of a Tribe would be netted against each other and one aggregate payment of any net amount due would be made to the Tribe, to be allocated among accounts as each Tribe deemed appropriate (netting to the "Tribal level"). The two methodologies produce different aggregate outcomes because of the associated concept of "forgiveness," whereby the government would forgive any amounts due from a Tribe to the government after netting.

The December report recommended netting at the Tribal level because forgiving errors representing amounts owed by Tribes to the government while paying for errors representing amounts owed by the government to the Tribes would result in what could be considered a windfall for the Tribes. Netting of errors to the Tribal level would prevent that windfall. A Tribal-level netting and forgiveness policy would result in the government paying approximately $3.5 million in principal and $6.6 million in compound interest, and forgiving approximately $4.4 million in principal and $3.7 million in compound interest. Netting at the account level, rather than the Tribal level, is estimated to increase the cost another $15.7 million, including principal and compound interest.

No netting at all, coupled with a forgiveness policy, would add $21.2 million in principal and compound interest costs.

Some Tribes were highly critical of the netting/forgiveness proposal. They argued that because the Project covered only a 20-year period, netting within this limited time frame was unfair, as expanding the Project in scope or time frames covered might have detected additional errors that would offset the errors identified for the 1972-1992 period. Some Tribes also asserted that certain accounts (primarily judgment accounts) were established to compensate Tribes for particular losses and that netting to the Tribal level against other judgment accounts or against non-judgment accounts might unlawfully deny the Tribe funds appropriated to achieve certain compensatory purposes.

We believe there is merit to Tribal assertions that adjustments to a particular judgment account should not be netted against non-judgment accounts or other judgment accounts. These judgment accounts were created pursuant to legislation or judicial decree to remedy a particular grievance. Distribution of these funds is generally governed by the Indian Tribal Judgment Funds Use and Distribution Act (25 U.S.C. §§1401-1408) or other specific Tribal judgment fund distribution acts that Congress has enacted. Under the Use and Distribution Act and for the most part, other distribution acts, a portion of the judgment account may be distributed to Tribal members on a per capita basis and the remainder allocated for particular purposes. To the extent those purposes are fulfilled and/or per capita payments made, the funds' governing provisions typically specify that any remaining funds be returned to the Tribe.

To prevent the dilution of the intended compensation paid by judgment funds, we propose a netting process in which judgment and non-judgment fund accounts would be netted separately. With respect to judgment fund accounts, we would net to the overall fund level for each judgment fund where the law pertaining to the use and purpose of a particular judgment account does not dictate that a specific percentage or amount be used for a particular purpose (i.e., where the law states that such funds shall be available for use "for educational, social welfare, economic development," but does not specify a particular amount to be used for such purposes). This would allow a Tribe to allocate the netted payment from the government, as it deems appropriate, to any specific activity or purpose consistent with that judgment fund's governing provisions. Netting would include principal and interest.

For judgment funds where the law pertaining to the use of such funds mandates that a specific percentage or amount of the fund be used for a particular purpose, we propose to net to the subaccount or activity level within the judgment account where possible. In this regard, it would be virtually impossible to reconstruct and adjust prior per capita payments to reflect either errors of overpayment or underpayment, since per capita payments are usually made based on the Tribal rolls existing at the time of the award. Moreover, current laws pertaining to the use and purpose of judgment accounts generally provide for the return of uncollected per capita payments to the Tribe after a specific period of time. The Tribe, in its discretion, could in turn choose to use these funds to supplement a specific activity as needed.

Non-judgment fund accounts would be netted at the Tribal level as previously proposed. This approach prevents windfall payments to Tribes and also prevents arbitrarily favoring those Tribes with multiple accounts over those with fewer accounts. Before any netting occurs, interest would be computed so that full credit would be given for an error notwithstanding at what point during the 20-year period the error occurred.

With respect to Tribal assertions that netting of errors based only on transactions from July 1, 1972 to September 30, 1992 is potentially unfair, we note that any additional errors that might be found if the reconciliation were expanded beyond the 1972-1992 period would be as likely to work to a Tribe's detriment as to its benefit. Absent reconciliation of all accounts for all time periods, a settlement covering any limited period could potentially result in an inequity. This will be taken into consideration in the settlement formula calculations. Finally, because Congress would authorize both the netting and forgiveness process by statute, we do not believe there are any legal infirmities in netting as we have proposed.

Based on the assumptions outlined in this proposal for payment of known errors, including interest, netting, and forgiveness of any net amounts that might be considered "due" to the government, the combination of cash paid out plus amounts forgiven results in a total cost to the government of approximately $55,875,846 ($16,471,145 paid to Tribes, and $39,404,701 forgiven). Disregarding any forgiven amounts, the out-of-pocket cost for settling known errors as of September 30, 1996, is approximately $16,471,145 (which comprises $4,634,453 in principal and $11,836,692 in interest). Interest would continue to accrue until payment occurs.

## Settlement of Claims for the Period 1972 Through the Date of Settlement

After paying known errors, the Department proposes to undertake a two-stage settlement process. In stage one, the Department would present each Tribe with a specific settlement proposal. The objective of this first stage is to minimize the transaction costs associated with developing a targeted settlement and direct that money to the Tribes, not to lawyers and accountants. Tribes that believe the proposal is fair would have the opportunity to end the uncertainty, distraction, administrative burdens and cost of further negotiations or litigation by accepting the settlement. For those Tribes that elect not to accept the proposal, stage two of the settlement process would provide an opportunity for government-to-government negotiations. We would employ the services of a mediator to participate with the Tribes and the Department in non-binding mediation. Only if these two informal dispute resolution mechanisms fail would formal adjudication of a Tribe's claims in a court of law become necessary or available.

## Stage One: The Settlement Offer

The government will present each Tribe with a specific settlement offer. This offer would be separate from the payment of known errors, which would be paid regardless of whether the Tribe accepted the settlement offer. The settlement proposal would be developed taking into account a number of factors specific to the Tribe. These factors would likely include the dollar value of each type of unreconciled transaction (receipts, disbursements and transfers), the error rates determined in the reconciliation for each type of that Tribe's transactions, the level of activity in the Tribe's accounts, including the amount of money flowing through the Tribe's accounts, and possible claims relating to investment yield, overnight interest earnings, deposit lag times and other errors. The proposal would cover the time period from July 1, 1972 to the date of settlement; however, the proposal would be in two parts which could be segregated: one covering July 1972 to September 1992, and one covering October 1992 to the date of settlement. In other words, Tribes would have the option of settling for only the 1972-1992 period, or settling for the entire period from 1972 through the date of settlement.

To provide Tribes with an incentive to settle at this stage, we would employ a formula for calculating the settlement proposal which assesses likely potential losses, utilizes assumptions favorable to

Tribes, and takes into account the resources saved by an early settlement. Initial work has begun to develop a formula that meets these requirements. The formula used to develop the settlement for July 1972 through September 1992 will employ information from the reconciliation project; a separate settlement calculation will be used to determine the amount for settlement of periods from July 1992 to the date of settlement. All Tribes, regardless of whether they accepted or disputed their account balances in the attestation process, would be presented with a settlement opportunity.

All Tribes would have the opportunity to have the settlement offer explained and any questions answered during the three months following the date of the offer. Each Tribe would then have four months from that time (a total of seven months from the date of the offer) to decide whether to accept the offer or to reject it and enter into government-to-government negotiations. Tribes that accept the offer would enter into an agreement that would resolve all accounting claims against the government for either the time period from July 1, 1972 through September 30, 1992, or July 1, 1972 to the date of settlement, whichever option is chosen. Tribes that accept the settlement offer only for the 1972-1992 period, however, would not be entitled to attempt to negotiate settlement of claims from the post-1992 period in the later, government-to-government negotiation phase (Stage Two). Any post-1972 claims not settled in stage one would have to be resolved through litigation. Department of Justice concurrence in all settlement agreements would be required.

If the settlement offer is not accepted (or no response is received) within seven months, it would be withdrawn. Tribes that fail to respond to the offer within seven months would lose the opportunity to participate in subsequent government-to-government negotiations, and as a consequence, would also lose the ability to bring a lawsuit regarding any claims covered by the settlement. Because the settlement offer would employ assumptions favorable to Tribes (e.g. forgiveness, compound interest, etc.) and would take into account the resource savings that an early settlement would provide, the settlement offer would not be the starting point for subsequent government-to-government negotiations should the settlement offer be rejected. Rather, the government-to-government negotiations process would be distinct and entirely separate.

### Stage Two: Government-to-Government Negotiations

If a Tribe rejects the government's settlement offer, it would have the opportunity to initiate government-to-government negotiations that would take the form of non-binding mediation. The process would be conducted with the assistance of mediators appointed by the Federal Mediation and Conciliation Service. Both the Tribe and the government would designate teams for the negotiation process. We expect that the government would be represented by Departmental employees and consultants, including employees of OST and the Office of the Solicitor, with assistance from Department of Justice attorneys.

Tribes would be given an opportunity at this stage to submit any additional documentation they may have with regard to transactions within the scope of the Project, and for the July 1, 1972 through September 30, 1992 time period, which demonstrates that an error related to trust fund accounting claims was made by BIA with respect to those transactions. A request for additional Tribal documentation was initially made during the course of the Project and this would allow one more opportunity for Tribes to produce any information they may have. Tribes could also submit additional information about transactions which were deemed to be reconciled even though

BIA and Arthur Andersen disagreed about the adequacy of the documentation to support the transaction (these were called "passed adjustments" in the Project).

At the request of the account holder or the mediator, the government could determine whether additional limited research or analysis would facilitate a settlement between the parties. If so, the additional work would be undertaken at the expense of the government. Any additional work would focus on additional, specific information-gathering activities or statistical analyses to fill in significant gaps in the Project. The legislation would include parameters governing the circumstances under which additional work would be considered appropriate for purposes of furthering settlement negotiations.

Under the auspices of the mediator, the Tribe and the government would seek to negotiate a settlement acceptable to both parties. The government-to-government negotiations with each Tribe would proceed for a period of no more than 12 months unless both sides agree to extend them. If a settlement is reached, the government, with Department of Justice concurrence, would be authorized to pay the settlement amount, in satisfaction of the Tribe's claims. If there is no agreement, the negotiation process would terminate. At that point, the Tribe would have six months to file a lawsuit according to the procedures and rules described below. At any time during the 12-month negotiation period, the Tribe and the federal government may mutually agree to terminate negotiations, and the Tribe would then have six months from that date to file litigation.

There is no basis to estimate with precision how many Tribes will accept the initial settlement offer and how many will initiate government-to-government negotiations. Certainly, the Department would seek to resolve the claims of as many Tribes as possible through these means. Because the negotiation process may be resource intensive, the legislation should authorize the Department to establish priorities for commencing negotiations. However, no Tribe would be prejudiced with regard to the time limits for commencing and concluding negotiations, as well as for filing a claim in court, as a result of the priorities established for the negotiation process.

Although GAO recommended that binding arbitration be employed to force a settlement of claims, the Department rejected this approach for several reasons. Some Tribes have expressed concern or skepticism about a binding, non-judicial approach to dispute resolution. Moreover, because arbitration results are binding, rules of discovery, evidence and procedure tend to be formalistic, inflexible and often almost as burdensome as actual litigation. In contrast, nonbinding mediation may present greater opportunities for a more collegial, informal, and flexible approach to defining the critical issues and developing innovative approaches to development and settlement of claims. Finally, the Department believes that a more efficient mediation process will lead to informal settlements, obviating the need for formal dispute resolution before the courts.

### Litigated Resolution of Claims for the Period 1972 to Date of Settlement

While the overarching purpose of this proposal is to encourage settlement of Tribal trust funds claims, it is not to force a settlement with Tribes who choose instead to litigate. Efforts have been made to build into this proposal incentives to settle, including the use of informal processes and a generous settlement offer at the beginning of the process. The Department believes it is in the interest of both the Tribes and the government to pay claims quickly and fairly rather than paying fees to attorneys and accountants for lawsuits. Nonetheless, should a Tribe desire to engage in litigation, this proposal does not prevent it from doing so. As stated above, however, a Tribe that

fails to respond to the government's settlement offer, and does not participate in the government-to-government negotiation phase would be barred from filing suit for claims covered by the settlement (this would include claims from 1972 through the date a response to the settlement offer was due).

Based on our preference for informal dispute resolution approaches, the proposal would preclude the filing of any new claims after November 12, 1997 (the date this proposal is being submitted to Congress), where such claims arise from the federal government's management and accounting of Tribal trust funds for the period July 1, 1972 through September 30, 1992, until after the claims have been submitted to the government-to-government negotiation process described above and that process has not produced a settlement. This limitation on filing new claims is not an absolute bar to filing claims. Rather, it simply requires Tribes to utilize the informal dispute resolution mechanisms outlined in this proposal before resorting to litigation. Moreover, the filing of any such claims would be required within six months of the conclusion of any unsuccessful government-to-government negotiations. Claims would be filed in the U.S. Court of Federal Claims. This venue is recommended because the Court of Claims is familiar with the Indian trust fund issues as well as claims for money damages against the government. Claims filed prior to November 12, 1997 would be unaffected by this proposal.

In any such litigation, once the Tribal account holder makes a prima facie case on liability, the government would bear the burden of demonstrating that the Tribe's accounts are correct. The legislation would provide that the government could meet this burden by putting in the record the results of the reconciliation and other efforts undertaken before and during the government-to-government negotiations to account for the Tribe's trust funds. There are several reasons for legislatively determining the quantum of evidence necessary to meet the government's burden of proof. By this point, the government will have invested considerable effort to reconstruct and reconcile accounts. It would be wasteful of limited government resources for a court to direct the government to engage in any additional wholesale document collection exercises. Given the condition of the records and accounting systems, and after the expenditure of $21 million over a five-year period, we believe we have accumulated most of the available documents. The cost of locating additional records would likely be very high and yield little additional information. Moreover, courts have accepted similar accounting information as sufficient in previous trust fund accounting cases. See, e.g., Red Lake Band v. United States, 17 Cl. Ct. 362 (1989); Minnesota Chippewa Tribe v. United States, 14 Cl. Ct. 116 (1987). Accordingly, once all available reconciliation data and related work product have been placed in the record, the burden of persuasion would shift to the Tribal plaintiff to demonstrate that it suffered a loss by virtue of the government's trust fund management or accounting practices.

A Tribe also would be precluded from introducing any Tribal documents demonstrating errors in the litigation that it did not produce during the government-to-government negotiation process. Given the significant investment of time and resources that both the Tribe and the government will allocate to this process, there is no reason why a Tribe should withhold these records until the litigation stage. This requirement would be consistent with the underlying objective of resolving claims in the informal dispute resolution stage.

We also want to ensure that a Tribe has the opportunity to be represented by capable counsel should it believe the government did not propose to compensate it fairly for its claims. At the same time, we do not want this process to benefit

primarily lawyers, rather than Tribal account holders. Accordingly, we propose to limit the amount attorneys could be paid to twenty percent of the total amount the Tribe receives through either a settlement or judgment in the litigation for awards up to $1 million, and for any awards above $1 million, up to twenty percent of that portion below $1 million, and up to ten percent of the portion above $1 million of the amount the Tribe receives.

The proposal also seeks to establish a fixed rate of simple interest at four percent that will apply to any amounts found payable to Tribes as the result of litigation. This rate of interest is the minimum rate provided by statute for the Tribal trust funds deposited in the Treasury. See 25 U.S.C. § 161a, § 161b.

The Department's legislative proposal also would clarify what we believe to be the Congressional intent that provisions in recent appropriations laws tolling the statute of limitations apply only to those claims for which the statute of limitations had not already run. In addition, the favorable treatment of claims with respect to netting, forgiveness and interest in the settlement context would not apply in litigation.

## Resource Requirements for the Settlement Process

The legislation needs to include a number of budgetary mechanisms to support the settlement process. The Department proposes the following budgetary framework to support the settlement proposal:[7]

- **Payment of Known Errors:**
  Permanent Definite Budget Authority

The Department proposes that permanent definite budget authority be provided to pay known errors, currently estimated at $16.5 million. In this case, the government's liability is clear, and as such, with the exception of the difference between compound and simple interest, direct spending is offset by the government's liability.

- **Settlement Offer:**
  Permanent Indefinite Appropriations Under 31 U.S.C. § 1304

- **Negotiated Settlement Amounts:**
  Permanent Indefinite Appropriations Under 31 U.S.C. § 1304

Department of Justice-approved settlements are, in effect, the same as judgments or compromise settlements of imminent or existing litigation and are therefore payable under the permanent indefinite appropriation for judgments established by 31 U.S.C. § 1304.

- **Additional Analysis under Settlement Negotiations:**
  Permanent Definite Budget Authority

---

[7] Definite authority is stated as a specific amount or "not to exceed" a specific aggregate amount at the time the authority is granted, whether in an appropriations act or other law, and the full amount so provided is recorded as budget authority for that period.

Indefinite authority is not stated as a specific amount. Rather, the amount provided is determined by specified variable factors, such as the amount of the receipts from a specified source, the amount of the proceeds from the sale of financial assets with recourse, or the amount necessary to cover obligations associated with entitlement.

Current authority requires congressional appropriations action on the request for new budget authority for the year involved.

Permanent authority becomes available pursuant to standing provisions of law without further appropriations action by Congress after transmittal of the budget for the year involved. When permanent budget authority is enacted, it is treated as permanent authority the first year it becomes available, as well as in succeeding years.

The Department proposes that the additional analyses that may be ordered by the mediators during the government-to-government negotiations be funded under permanent definite budget authority. The Department proposes permanent authority as it is critical that the funds be available to support the negotiations, otherwise the negotiations would not be an option and Tribes would increasingly have to rely on litigation. The amount available should be authorized at a specific annual amount to ensure that additional work is directed only at worthwhile analysis.

- **Federal Negotiation Teams and Authorization for Annual/Current Mediation Services: Discretionary Appropriations**

The Department proposes that funding to support Federal negotiation teams be provided under annual discretionary appropriations. There should be sufficient lead time to help ensure funding is available.

- **Overdrafts & Accounting Deficiencies: Permanent Indefinite Budget Authority**

The Department proposes that permanent indefinite budget authority be provided to cover overdrafts & accounting deficiencies. As discussed in the December report, these amounts relate to the restoration of overdraft interest clearing accounts (which apply only to IIM accounts) and settlement of miscellaneous losses (which apply to both Tribal and IIM accounts). Essentially, the funding is required to eliminate an overall "trust fund deficit" resulting from trust fund liabilities exceeding trust fund assets. While not directly related to the Tribal settlement proposal, it is critical that once these discrepancies have been investigated, authority and funding be available to make the appropriate accounting adjustments; otherwise, liability for these errors continues. The Office of Special Trustee has completed research on the discrepancies for Tribal accounts, and projects that the initial research on the IIM account discrepancies will be completed sometime in fiscal year 1998. The preliminary estimate of funds required to cover these deficiencies is $51.1 million, although the amount ultimately could be substantially lower or higher.



# 5. CONCLUSION

The Department's management and administration of Tribal trust funds has been the subject of numerous reports, recommendations and critiques over several decades. While there may be disagreements about the magnitude of Tribal losses, there is no dispute about several key principles. First, Tribes are entitled to management and administration of their funds in a manner that meets the Secretary's trust obligations and legal requirements, and assures the proper accounting and investment of funds. Second, the complexity of the Department's management and administrative responsibilities have far outstripped the capabilities of the Department's systems and practices and they must be upgraded. Third, fractionation of ownership interests on Indian allottee lands must be halted and reversed. Fourth, if Tribes have lost money as a result of inadequacies in the Department's systems and practices, they should be compensated.

Never before has the federal government been so determined to achieve these objectives. At the direction of Congress, it has completed a five year, $21 million reconciliation to identify shortcomings in accounting for Tribal funds. It has proposed legislation to address fractionation. The Special Trustee has submitted a strategic plan and he and the Department are now together focusing attention on effectively reforming the management and accounting systems. This report offers the final piece — an approach to reimburse any losses that may have occurred.

Certainly, this is not the only way to address the issue of potential Tribal losses. But it puts forth for public discussion and debate a framework upon which to proceed. The Administration looks forward to working with Congress and Tribes to enact legislation that will meet all of these goals.